Our third case this morning is 22-107-8-3, Traylor v. Yorka. Good morning, and may it please the Court. My name is Miles, and you're looking at my reference to the appellant, Marcus Traylor. I would like to start with the issues that we raised on appeal, and then I will turn to the issues raised on cross-appeal. Our first issue asks whether the District Court erred in granting summary judgment on our claim for excessive force. When I was sitting here this morning listening to the first argument, Judge Duncan made a point about being plain, and I think this is an opportunity for me to be plain with the Court. When I reviewed this issue for preparation for oral argument, it seemed to me that the resolution of this issue is ultimately going to turn on whether or not this case is resolved by Scott v. Harris. I think if the case is resolved by Scott v. Harris, the Court probably decides against us. But if the Court decides not on Scott, on other grounds, then I think we have a fact issue that should preclude summary judgment. Now, I'm well aware the Court's read the briefs and that there's been a lot written in this case, but I think it's important to review the essential dispute in this case. For Appley, and if people don't mind if I just call him Appley instead of cross-appellant and all that, for Appley, the issue is my client attacking him in an alcohol-fueled rage. For my client, it's different, and my client says he was going back and asking rather emphatically for someone to go get his wallet. If this case is resolved on Scott, his arguments don't matter. If it's resolved outside of Scott, then they do. But for three reasons, I'm going to ask this Court or I'm going to tell this Court why I think Scott shouldn't resolve this case. And first, and I think Judge Haynes made this point in the last argument, that we are here, of course, on de novo review. So it doesn't really matter what the trial court did. But the trial court, you know, is a federal district judge. She's a smart person. And when she resolved this case in the first instance, she resolved it against my client. But she didn't resolve it on Scott. She went through the analysis of it. And so I think that is, well, I'm not binding in any means on this Court. I do think it's a consideration that should weigh in how we resolve this case. The second reason I don't think Scott should resolve it is that the video, and it is an evocative video, but the video is silent. And when we look to the evidence and the arguments that were made here, much of the disputed evidence comes in the form of what my client said. Now, I think it's important to emphasize that it's what my client said to Apolline, not just what my client said. Because of Apolline, the point Apolline makes is well made, that you do have to rely on what the person who used force knew or was knowable to him when the force was used. But if my client went up and emphatically was saying, I just need John or I need Tom to get my wallet, I need Tom to get my wallet, that would be a fact knowable to Apolline at the time. The problem is if you're the person and the other person is running up to you way taller than you, really angry, much bigger, you only have about a second to decide, should I push back or should I be pushed? And that's the hard part. This isn't some long discussion that we can sit around a table and decide how to handle things. So how do you address the fact that your client was running up at the appellee? I thank you for the opportunity. I think that's sort of the essential question and why I turned to the issue about Scott. And I have to say that the answer to that is that we're here on summary judgment. Ultimately, it's a jury decision about what was done here. But we do have a video. You do have a video, a silent video. Okay. But what I'm saying is to me, even if he was saying, I want my wallet and running up at him, you still just got the second. If there was time to think about it and whatever, it would perhaps be a different case. But if somebody's running at you, screaming about their wallet and much bigger than you and about to land on you, is it . . . I . . . Is it not qualified immunity to . . . I understand your question, Judge Haynes, and I'm trying to answer it the best I can. And that is that first of all, my client stayed on the outside of the police state. He didn't cross over the police state. If we believe what he has said, he is asking not for him to get his wallet, which might suggest he's going to go back into the club. But, he's asking for someone else to get it. I need John to get it. I need Tom to get it. And if a jury decides that the client runs up and he's saying, I need someone else to get this. I need John to get this. I need Tom to get this. A rational jury could decide that the use of force was improper. And because we're here on summary judgment, I think the question is, do we have a genuine issue of material fact? And I think the video, while Scott v. Harris is certainly an enticing way to resolve this case, and I could understand why the court would look at that approach. It gets to my third point, which is really, I don't think we get to a Scott v. Harris. This doesn't rise to the level of Scott v. Harris. We talk about Scott v. Harris a lot in this court and a lot in briefs from my side of the table. But, it's good to go back to what Justice Scalia wrote and what he put in that and the facts of it. And I think when we go back to Justice Scalia's original opinion and Scott, we simply don't get there. In that case, the argument in opposition to summary judgment was so blatantly contradicted by the record that no reasonable juror could have believed it. And I just don't think we have that here. If my client was going and asking for Tom or Susan or Jane to go get his wallet, then it becomes a fact question for a jury to believe whether or not the use of force was objectively reasonable. For that reason, we ask this court not to resolve this case by Scott. And instead, we contend we have a classic fact issue that should be resolved by a jury. But that, of course, doesn't end the analysis of qualified immunity for this case. We have to go to the question of whether or not the law was clearly established. In doing this, we've submitted, I'm sorry, we've cited to familiar cases, cases that everyone in this room is probably tired of reading about. Bush, Darden, Newman, and DeVille. Newman to a little bit less. But I think the issue came from the district court, which said that the requirement that the district court was laboring under was to find a case that was particularized to the facts of the issue. Now, we all agree, of course, the Supreme Court, this court, probably every court in the country has been clear that you can't be overly general. And we're not asking the court to do that. The cases we cite should put this issue, the issue of using this level of force on a defendant who is not resisting, not fleeing, and in our version of events, not presenting a threat to anyone else beyond question. So, when we look at Bush, and I won't go through all of these, but I do think it's important to highlight just a couple of points. When we go through Bush, that's, of course, where the officer used force when the suspect was handcuffed and subdued. For the district court, she distinguished this case on the ground that the client wasn't, that the appellant wasn't handcuffed or subdued. I think that's too particularized. I think that gets too granular, and that's not been the standard for anybody. Really? Yes. Don't you have less . . . you have the same potential harm by somebody who's handcuffed as someone who's not and is running at you? No, Judge Haynes. I don't think . . . of course, you do, but I think . . . I mean, hands matter, don't they? Absolutely. Hands matter. Okay. And I don't mean to suggest otherwise. What I mean to suggest is that the analysis the district court used in dismissing our use of Bush is too granular. It's gone too low, and what we're saying is that the point here, the point that we can use Bush for, even though our client is not handcuffed, our client is not restrained, is that this level of force on an arrestee or a defendant who is not resisting, not fleeing, and in our argument, under our client's version of events, posed no threat to anyone else . . . What case says an officer has to accept someone's word, I just want to get my wallet, I'm not coming up to stab you, to knock you out, to shoot you? Where does the law say you're required to accept as a fact that an aggressive approach with a company with non-aggressive words, I'm just coming to get my wallet, you're required to accept that and let the person do what? Chief Judge Richmond, if I can rephrase that question, I don't mean to avoid it, and if I do, I'm sure you'll tell me, but the way I think I would have to phrase it, the only way I could answer that in favor of my client is to say that the level of force was not permissible in this case because we had a defendant who was not resisting, who was not attempting to flee, and who was not . . . He'd been told to leave the area and he came back. Well, he had been told to leave the club and he'd been told to leave the general area, but I don't know that that constitutes resisting, I don't know if that constitutes flight. It's a question of threat to the officer. Excuse me? It's a question of threat to the person . . . he'd been . . . the person who was assaulted, or who was afraid he was going to be assaulted, was told your client had decked somebody else, he'd been told to leave the area and he comes back. And I would say that the use of force came, of course, after that, and so that is . . . Right. What case is you have to stand your ground and wait until he swings at you before you take action? If the standard is that I have to wait, if I have to get to a case that particular, I cannot show you a case that particular. Bush, Newman, DeVille, Darden do not get that particular. What they say, and these are the cases I relied on, and I relied on them for the idea that a defendant who is not in flight, who is not resisting arrest, and who is not being aggressive to the police officer, not causing a threat to others, this level of force is . . . The key there is threat to the police officer. And that goes to the summary judgment question, and I understand that there is evidence on the other side. Is there objective . . . could an objectively reasonable officer think he was in jeopardy? I think it is a fact question about whether an objectively . . . Would every reasonable officer understand he was not under threat? I have . . . Chief Judge Richmond, I think the answer has to be that that is a fact question, and that goes to what is being said by my client to that officer at the time. I just . . . I'll be honest with you, I just disagree. And I have . . . I just can't imagine that you have to . . . every reasonable officer would know they have to stand there and wait to see if he's actually going to take a swing at him or otherwise threaten him. Well, I can't . . . I've done what I can to persuade you that that's . . . Under these circumstances. Under these circumstances. This is not someone just standing on a street with no prior interaction or no . . . Well, to that point, I mean, Officer Yorka walked my client out without any particular problem. After what? Walked him out of the club. After what? After there was an incident of which there are fact questions. So, some people would say my client started a fight. Some people, my client would say he was sitting on a bar stool and was pulled over backwards and onto the floor. But Yorka was told there was a fight. There's no dispute about that. I think Yorka was told that there was . . . I don't know that it had gotten specific. He was told there was a fight. I don't think the record says . . . Right. So, he was told there was a fight, so he knew something was going on. He knew something was going on. Then he takes my client and he escorts him out. My client doesn't pull away. He doesn't push back. He doesn't say, hey, get your hands off of me. But then he doesn't leave. He leaves. Well, he goes outside of the club, which I think is a report mistake. Right. But then he doesn't leave when he's told to leave and all that. Did you want to address the fabricated evidence false charge? Sure. Thank you, Judge Haynes, for getting me over to that. And I think this is an important, of course, question, and I'm farther along in my time than I thought I would be. But . . . Well, I'll tell you my concern about this one is that it seems to me this is purely a one person said X and the other person said Y. Right? Your client said, I didn't push him. The officer said, yeah, you did push me. Well, I think . . . Right? There's nothing else for us to look at. Well, I think you can look at the video and not see a push. No, no, no. But I thought the allegation was that there was an earlier push and the officer said, yeah, he pushed me earlier. And your client said he didn't. Judge Duncan, the story changes a lot in this. But I think you're correct. In other words, my concern is that whenever there's a confrontation between an officer and an arrestee or anybody, almost always you're going to have people say, well, yeah, I did this. And the officer said, no, no, no, he did this. And I guess sometimes that can create fact issues with respect to summary judgment. But here it's a . . . what the claim is fabrication of evidence, which I'm concerned that we will have defeat of qualified immunity, go to trial on fabrication of evidence. Every time there is a disagreement between an officer and an arrestee over what actually transpired. So I would direct you to page 15, I think it's 1512 of the record on appeal. And that is where . . . and I may be wrong on that, but I think it's 1512. And that is where the officer has . . . and I see I'm about to run out of time. That's fine. Please answer. That is where the officer has written down. It's not just somebody said this, somebody said that. It's where the officer puts down actual evidence. It goes beyond what's happening in the moment. What does he write down? I don't remember. What does the officer write down? He explains how my client shoved him and that resulted in him punching my client and the officer having to then go get his hand treated. And so . . . Your client says that didn't happen. My client says that didn't happen. Okay. And I recognize I've run out of time. I'll come back and address Cole. Thank you for your question. Good morning. May it please the Court. I am Chavis Ligon for Officer Eorka. To address some of the issues Dr. Ehrlich brought up quickly on the Fourth Amendment excessive force issue, the push that was alleged to have happened, happened well before the video cut off. The video . . . The fabrication of evidence thing, right? Right. Sorry? You're talking about the facts underlying the fabrication of evidence claim? That's correct, sir. There was never a claim that the video showed that there was a . . . at all. So, I'd like to spend the time I have to address the qualified immunity issue on Cole. Given the circumstances of the allegations and facts in Cole, officers in this situation of a mundane he said, she said allegation were not put on notice that they could face a federal jury for unlimited federal court damages, impunitive damages, and attorney's fees. If they arrest an individual and that person says, well, I didn't do it, as Judge Duncan noted, it's a common occurrence for people to say, I did not do what the judge said. Like every single case. Correct, Your Honor. And in this scenario, the judge or the district court applied Cole in a, I don't want to say superficial or pejorative way, but in a kind of rote manner that there was an allegation of fabrication, there was an allegation of fabrication, there was a loss of Fourth Amendment claims, so the substantive due process claim kicks in, et cetera. Whereas in Cole, to touch on what Your Honor brought up earlier, fabrication is different than the dispute. Fabrication in Cole has significant evidence of police, of a complete police conspiracy, of officers taking their own time to develop their story, supposedly. That's my memory. I was just new on the court then. I was one of the first on bonks I sat on. It was just a lot of fun. And I recall the allegations there were the cops got together and sort of said, yeah, let's see, what are we going to do? I mean, I'm not saying they did this, but the allegations were let's get together and figure out how we can show that this guy actually turned the gun on us and wasn't just pointing it at his head. That was my recollection of what happened in Cole. That's correct, Your Honor. In Cole, the officers received special treatment. They were never given Miranda warnings or Garrity warnings. The statements weren't recorded. They were given days to provide their story. And in this situation, there's no evidence. Officer York was directed to go to the Public Integrity Unit that very evening. He gave a sworn statement, which corroborated his story at the scene. There's no evidence that he was given time to even go talk to a lawyer, which he certainly had a right to do. So that evidence isn't here. Secondly, the evidence in Cole was supposed to have been, and apparently was according to the district court, substantial. It was forensic evidence of stippling and ballistics. It was expert testimony and supposedly recordings that proved that the officers' allegations were not true. Here, you do not have that evidence. You have a simple he said, she said. The harm in this case, Mr. Traylor was never indicted on a felony. He was never placed under house arrest like the individual was in Cole. What happened with it? He was never indicted. There was something about there was written down there was a felony charge, but it was immediately downgraded or something like that. That's correct, Your Honor. So at the scene, another officer entered in what Officer York had told him were the events, and then another officer classified that as a felony too. He misclassified the claim as a family violence claim. That evening, after Officer York gave his sworn statement to public integrity, in which he said, look, he shoved me, I didn't feel any pain, that takes what would have been potentially a felony and drops it down into a simple Class C misdemeanor assault. So based on Officer York's testimony that very evening, the felony went away as opposed to in Cole where the conspiracy began and took days to come up. Here on the very evening, Officer York did what he was supposed to do. I hear what you're saying. I'm just trying to think how we distinguish Cole. This is an interlocutory appeal, right, with respect to this issue. Correct, Judge. So we can't reassess the genuineness of any fact. We can't say, oh, no, there's really not a fact dispute. We don't have jurisdiction to do that. So what exactly is your argument for why we should reverse them? It's not a fact issue because it is a question of law, of whether evidence even exists or whether the law is correctly applied. The law in Cole is reserved for situations where there's, as I read it, significant evidence of malicious, intentional, depraved, brutal, uncivilized behavior, where there is substantial amounts of harm and of shady police dealings. And that evidence, that harm, that police conspiracy, those charges are not here. Do you admit that your statement that Manuel overruled Cole is wrong because the second part of Cole came out after Manuel and expressly addressed it? Your Honor, we were preserving this court in a footnote. Just note that it was aware of Manuel and it did not, in its decision in Cole 2, the 2019 case, specifically find that Manuel overruled Cole. That's correct, Your Honor. You're not saying that Cole . . . I mean, because I read your argument and I thought, wow, Cole's an en banc decision of our court, quite apart from the Manuel and the timing of that. I mean, I'm not aware that the Supreme Court has done anything to overturn Cole. No, correct. I just sent it in the case. I'd be delighted if that had happened, but it's . . . We expressly addressed it, and the notion that O. Manuel is after Cole was just incorrect in your briefing. Yes, Your Honor. Okay. I agree with you. Yeah, absolutely. I briefly want to touch on the wrongful arrest claim. I don't think in their briefing there was a lot addressed in there. Numerous examples of circumstances and behavior on Mr. Traylor's part created substantial probable cause for arrest for multiple instances. And lastly, Your Honor, Judge Duncan brought up the fact that there would be numerous cases that would not survive, or that would survive summary judgment, rather, and go to a jury. Yeah, there were a mere disagreement between an arrestee and an officer about what transpired. Correct. And I can give the court several examples, both of which involve the individual saying, I didn't do it, and the officer saying, Yes, you did. Crim versus County of Aransas, Texas, and Robinson versus City of Garland. I guess just thinking out loud, my point is that there's got to be a distinction between that garden variety scenario and a fabrication of evidence claim that would survive a summary judgment motion and have to go to the jury. Correct. And as we noted in our brief, the Third Circuit and the Halsey case, upon which the Cole Court relied, said it would be a rare case for an officer not to succeed in summary judgment because the standard would be higher. And here in Cole, the standard was higher. And at the district court level, they found that the allegations were true as well, that the case was riddled with evidence of police malfeasance, conspiracy of purposeful fabrication. Whereas in our case, it was simply, as we said, he said, she said. Tell me again, when is the allegation that the officer makes a statement about a shove or a punch happening that was in the bar, allegedly? That was outside.  Correct. Yes, Your Honor. Officer Yorka said that the shove occurred a few seconds before the video turned up. I would also like to address the issue of the officer, Officer Yorka's use of force in this case. Police officers do not have to rule out benign motives. Officer Yorka had about a second or less to make a decision on whether or not to apply force. That force was part of an escalated process. Whereas in the bar, Officer Yorka used a police hold to escort him out. He then released him and specifically told him it's time for you to go. You got to go. And an officer or Mr. Trailer's sworn testimony, he said he was telling me to leave. So it's unequivocal that he was being told time for you to go. Secondly, the use of force was also justified based on the circumstances. Officer Yorka is clearly outnumbered. There was another officer at the scene, but he can't be seen in the video. And so if Officer Yorka is taken out, Officer Yorka has a gun. And at that point you have a crowd with potentially a loose police weapon. Third, as seen in the video, Officer Yorka didn't have anywhere to retreat. I think it is not dispositive, but it is certainly telling that Mr. Trailer's hired expert, former police trainer, admitted twice, once under oath and once in his expert report, that a reasonable officer would have viewed Mr. Trailer's approach as aggressive. Mr. Trailer's protestations that he was simply saying, I wanted to go get my wallet. That may be true. He may have been saying that. It does not create a material issue of fact in this case, because an officer is not required to accept someone's explanation for why they're approaching with their shoulders down and head coming straight towards them. On the qualified immunity context, I think Judge Duncan, you brought this up earlier. A he said, she said, situation can essentially give a second bite at the malicious prosecution apple, simply if the suspect says, I didn't do it. So qualified immunity and all the developed law and the fourth amendment context about use of force and arrest probable cause essentially doesn't mean anything. It can be bypassed by a suspect saying, I didn't do it. That is clearly not what Cole was for. Cole was not for creating a second bite at the malicious prosecution. But the case you relied on was Manuel. Is there any other case you're relying on for your proposition that we need to reverse the district court on this? I think there's persuasive authority where courts that Cole relied on, those cases have been reversed. The Moran decision, I believe out of the eighth circuit, the third circuit and the delayed decision. And those are, we have to follow Cole. Yeah, we've got, we do have to follow Cole. And so then the question is, well, does Cole clearly establish the law with respect to this scenario? And that, that's why we believe that the trial court erred in denying qualified immunity. Assuming certainly that Cole is still good law. Nothing about that, but any kind of officer on notice that this was a situation where you could face a substantive due process violation. There's nothing new about the proposition that you can't fabricate evidence. That's not what Cole created. Officers should have known that. And there's been cases on that for decades. That's not what's an issue. What's new is that a substantive due process, right? Appears when probable cause exists. As, as noted, the district court did not cite any case that was analogous, close to what we have here. The district court's opinion is saying she felt bound by Cole to deny summary judgment. I think that's pretty short. It's like two pages. Correct. I think the, that's telling given the length to which Cole went to explain why these, this circuit felt the need to go find a substantive due process, right? For someone who had been agreed, given the extraordinary amount of facts and the depravity of the circumstances, the allegations in Cole go on for pages and pages of horrific allegations where he is here. It's correct. The judge said, well, he said it was fabricated. That's good enough. To leave this decision undisturbed, I think would have very real, very real world police consequences. I teach at the DPD Academy and we discuss qualified immunity and uses of force. And the qualified immunity is not a get out of jail free card, but that it's for the gray areas. And now we teach them except that's true, except when someone tells, tells the judge or files a lawsuit that says I didn't do it. So all that other stuff, fourth amendment protections, probable cause protecting you, qualified immunity is protecting you. That's always there, except in one case. And so police would then have to make the decision. Why do you now have to tell officers that because of the, this decision, because of the trial, the trial force decision. Oh, it's a, now a risk, a viable, a quite viable risk that you can face a jury based on such thin allegations. So we would ask the court to reverse and render on the qualified immunity issue. I think not. I mean, I agree with judge Duncan that this could be very broad, but not everybody has it dismissed. And that would be different if they were prosecuted and so on and so forth. That's a different case. I mean, it's a different case. You can't sue for that. If they are convicted, they can sue under the 14th amendment. That's correct. I think what Cole was trying to do was fill a hole. The fourth amendment is pretrial protects pretrial rights. The 14th amendment protects post-conviction. Because of the fourth amendments. Claim drop dropping out. There was essentially a hole in between those two things. And Cole tried to fill that hole. So that there was some redress for actions that happened pretrial, but, but pre-conviction. Cole tried to fill a hole where there was absolutely egregious circumstances. And when it were, it was an event where the court said we simply cannot sit on our hands and let this happen. So I would lastly mention that. Individuals in Mr. Claim are. The disputed evidence is because the officer made it up like this. There are other avenues for redress. First of all, there should be internal processes at the police departments. Secondly, that evidence could and should be thrown out of court if it is shown to have been fabricated. And third officers are subject to criminal prosecution for fabricating evidence. So it is not as though if this court reverses the trial court decision that. Individuals in Mr. Traylor's position would be denied any sort of redress at any point. What Cole was about and how it was applied here is about section 1983, civil damages, not about redressing rights. There are other options, other avenues for it. And. It should go without saying, but any violation of someone's rights. It should shock the conscience. We are not saying that an officer making up a Tic Tac file like a shove is okay. It's not that big of a deal. Wink, wink. We all do it. That's a bad thing. That's a violation of his constitutional rights and it should be vindicated. But Cole is not the appropriate vehicle to do that. And under these circumstances, remind me in Cole, because of the fabrication of evidence, the young man was, what was he charged with? Assault on a public official felony assault on a public official. And he was, I mean, how did that get, I just forget the procedural issue. What, what was that resolved somehow or. Even in the criminal case, your honor. Yeah. That case was dismissed. It was dismissed. So he was indicted, placed under house arrest. He had hired counsel. And then at some point later, significantly later, it was dismissed. Okay. I see. I see. All right. Unless court has any other questions. Thank you. Very quickly on the issue of wrongful arrest and the matter of, and I meant to address this earlier. I just don't think we crossed the bar on that one. I don't think our argument is sufficient. And I, we only had two pages of briefing on it. I don't think we're sufficient on that. And I didn't address it. Earlier. Turning to Cole. When I listened to the argument, especially between Judge Duncan and counsel, it seems to me that the court appears to be looking for an answer that we haven't provided in the briefing. And that is taking one step beyond Cole. And this may be a case. You won on the issue, frankly, in the district court. I'm not criticizing your briefing. Oh, no, no, struggling with the sort of, okay, I get what happened in Cole. What is, what, what would making this go to a jury imply? And judge Duncan, I meant to say that in the briefing that we've submitted to this court, I don't know that either side has addressed that as well as we should have. And this may be the rare instance where a little bit of supplemental briefing on that particular issue would benefit the courts resolution. I'm going to stand up here in front of you right now and tell you fact, issue, fact, issue, fact, issue, that there are all these fact issues. Which we can't address the genuineness of. Which you can't address the genuineness of. We're on interlocutory appeal. Let me ask you this. So based on the statement by the officer regarding the push or the shove, the district court said, well, look, he was here in the charge sheet. He's charged with a felony, right? And she thought that was significant. It was downgraded. Was it, why was it downgraded? When was it downgraded? It was downgraded pretty quickly. I think within 48 hours it was downgraded. Specifics of why it was downgraded, I don't know. Okay. We don't know. It was downgraded to. I think an ordinary assault, maybe. Okay. But it was not a, and then ultimately dismissed, of course, but it is our position. What was it? What was it? What did the charge sheet say he was originally charged with as a result of the officer's statement? I think it was assault on a public servant, which could be a judge or a police officer. Okay. Well, and your client claimed that he had to hire a defense attorney and he lost income from that, but also his employer wouldn't let him work because of the charge. And he was. He did suffer damages from the charge, even though he was ultimately not. Yes. That's correct. From the charge that was downgraded within 48 hours. Well, that's what the client has testified to, right? That's what's in the sworn testimony. I don't have any reason to disbelieve that testimony. And so I've relied on that. And it's genuineness anyway. I mean, exactly. This isn't, we're not the jury. So, but I do think. I guess what is your best. Argument. That by applying coal in this case, we're not suddenly making everybody who gets charged by a police officer able to sue that police officer. And Joe change. I think the best argument is that this goes. Beyond simply just saying, you had a road, she had marijuana. You didn't have it. It gets written down. It gets submitted. It gets put in. And then eventually the court says no, or the police say, no, that's not right. And they take it out. That's that's the fact. I think if you look at page 15, 60. Of the record on appeal. You'll see where that is written down. It's not just this dispute about what's happening. It's the recording. It is making that evidence. Writing it out. That changes it from just. Just the ordinary sort of dispute. And I, but I do think this is an issue that, that the briefing on both sides really kind of. Comments on both sides.   It's a question that we would have to address fully. And we would do better. To come back. You want to write a supplemental brief on how this. How coal applies here in your opponent would say how it doesn't or. Yes, because I. Chief judge, but I just. Of course, no one's going to say. I mean, I don't think anyone's really saying coal doesn't apply. Council doesn't like it, but. It applies. The question I think in the briefing didn't go as clearly as it should have about how to apply coal under these particular circumstances. That's what I hear the court struggling with in its answer. You've got two advocates here. I think to provide a better answer for you. And writing. That's my. That's my. Pitch to the court on, on that. I see. I have 15 seconds left. If there are no further questions, we thank the court for their time. Thank you. If we, if we decide for the briefing is, would be helpful. We'll let both sides know. Yes, of course. Thank you. Thank you. Plain that the district court. Applied this case in a. A manner that was. Not not applying this law is clearly established. It's not clearly established that this type of behavior that would result In a cold circumstance. For example, throughout our briefing, we talk about the fact that this is a class C misdemeanor. You're asked what charge it was dropped down to. It was actually dropped down that night to a class C misdemeanor. Class C misdemeanor is the lowest type of criminal charge in Texas. One example is you can get a class C for parking. Displaying a counterfeit. Handicaps. That's the level of crime. That's the level of crime.  That's the level of crime that's associated with this. Minor in possession of alcohol. The maximum penalty that Mr. Traylor faced was $500. He did not face. Do you think y'all should file supplemental briefing? Certainly if the court requests it, I think we addressed it. Pretty substantially in our case that this. Cold. It was. Not applicable here. But if whatever the court would. Order, I would be happy to do. Thank you.